UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS,<br><br>                Plaintiff,<br><br>    v.<br><br>SHEA CONCRETE PRODUCTS, INC.,<br><br>                Defendant. | Case No.<br><br>**COMPLAINT** |

**INTRODUCTION**

1. Shea Concrete Products, Inc. operates a concrete products manufacturing facility at 87 Haverhill Road in Amesbury, Massachusetts (the "Facility"). The Facility consists of 24 acres of partially paved surfaces.

2. Shea discharges industrial stormwater from numerous locations at its Facility into wetlands connected to the Merrimack River ("Merrimack River Wetlands"). Shea's discharges flow directly into Merrimack River Wetlands from the north side of the Facility, and also flow to Merrimack River Wetlands through the Town of Amesbury's municipal storm drain system ("Amesbury Municipal Storm Drain System"). Shea is not properly monitoring or controlling discharges at all outfalls as is required by the federal Clean Water Act. 33 U.S.C. § 1251 et seq. (the "Clean Water Act" or "the Act").

3. Shea's stormwater contains pollutants, including sediment. Sediment consists of loose sand, clay, asphalt, silt, or other material that mixes in the water column and settles at the

bottom of a body of water. The United States Environmental Protection Agency ("EPA") has identified sediment pollution as the most significant cause of water quality degradation in the Nation's waters. Excessive sediment discharged to wetlands and waterways destroys habitat, harms aquatic organisms, and can contribute to flooding.

4. Wetlands play an essential role in the ecology and hydrology of watersheds. Among other things, wetlands provide habitat for important species, protect downstream water quality, and prevent flooding. Stormwater contaminated with sediment can harm wetlands by, among other things, suffocating the native species and allowing noxious and invasive species to come in and dominate the area. Sedimentation can also decrease wetland volume, decrease the duration that wetlands retain water, and change plant community structure. This can severely harm vegetation, soils, and downstream water quality and significantly increase the risk of flooding.

5. Shea's discharges of polluted stormwater to Merrimack River Wetlands and the Amesbury Municipal Storm Drain System are in violation of the Clean Water Act. The Commonwealth of Massachusetts (the "Commonwealth") brings this civil suit to enforce the requirements of the Act. The Commonwealth seeks injunctive relief, civil penalties, and other relief the Court deems appropriate to redress Shea's illegal discharges of pollution.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

7. On August 6, 2020 the Commonwealth provided notice of Shea's violations of the Clean Water Act, and of its intention to file suit against Shea (the "Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator

2

of EPA Region 1; the Commissioner of the Massachusetts Department of Environmental Protection ("MassDEP"); and to Shea, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).

8. More than sixty days have passed since notice was served.

9. This action is not barred by any prior state or federal enforcement action addressing the violations alleged in this complaint.

10. The Commonwealth has an interest in protecting for its residents the integrity of Massachusetts waters, and the related health, safety, economic, recreational, aesthetic, and environmental benefits those waters provide. The interests of the Commonwealth have been, are being, and will continue to be adversely affected by Shea's failure to comply with environmental laws, as alleged in this Complaint. The requested relief will redress the harms to the Commonwealth caused by Shea's activities. Shea's continuing commission of the acts and omissions alleged in this Complaint will irreparably harm the Commonwealth, for which harm it has no plain, speedy, or adequate remedy at law.

11. Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

**PARTIES**

12. Plaintiff is the Commonwealth, appearing by and through the Attorney General.

13. The Attorney General is the chief law officer of the Commonwealth, with offices at One Ashburton Place, Boston, Massachusetts. She is authorized to bring this action and to seek the requested relief under G.L. c. 12, §§ 3 and 11D.

14. Defendant Shea Concrete Products, Inc. is a domestic corporation that operates a concrete products manufacturing facility at 87 Haverhill Road, Amesbury, Massachusetts. Shea

Concrete manufactures concrete prodcuts such as septic tanks and bulkheads, as well as stormwater products such as culverts, trench drains, and filtration systems. In addition to having a location in Amesbury, Shea Concrete Products, Inc. has locations in Wilmington and Rochester, Massachusetts and in Nottingham, New Hampshire.

## STATUTORY BACKGROUND

### Federal Clean Water Act Requirements

*Prohibition on Unauthorized Discharges of Pollutants*

15. The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge complies with certain statutory requirements, including the requirement that the discharge be permitted by EPA under the National Pollutant Discharge Elimination System ("NPDES"). *See* Sections 301(a), 402(a) and 402(p) of the Act, 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

16. Industrial stormwater is runoff from precipitation (rain or snow) that lands on industrial sites such as concrete products manufacturing facilities. This runoff is often polluted by materials that are handled or stored at such sites.

17. Stormwater is the leading cause of water quality impairment in Massachusetts. During every rain or snowmelt event, runoff flows over the land surface, picking up potential pollutants such as sediment, nutrients, metals and petroleum by-products. Polluted stormwater runoff can be harmful to plants, animals, and people. Excess sediment clouds the water, makes it difficult or impossible for aquatic plants to grow, and destroys aquatic habitats. Excess nutrients cause algae blooms that reduce dissolved oxygen in the water column, harming fish and other aquatic organisms. Bacteria and other pathogens can wash into swimming areas and create health

hazards. Toxic pollutants can poison aquatic life. Land animals and people can become sick from eating diseased fish or ingesting polluted water.

18.     Impacts from stormwater pollution, including sediment, pose particular risks to wetlands. Wetlands are among the most productive ecosystems in the world, comparable to rain forests and coral reefs. Wetlands play an integral role in the ecology and hydrology of the watershed. The combination of shallow water, high levels of nutrients, and high primary productivity is ideal for the growth of organisms that form the base of the food web and feed many species of fish, amphibians, shellfish, and insects. Many species of birds and mammals rely on wetlands for food, water, and shelter, especially during migration and breeding. The holding capacity of wetlands also prevents floods and erosion. Wetlands function as natural sponges that trap and slowly release surface water, rain, snowmelt, groundwater, and flood waters. Trees, root mats, and other wetland vegetation also slow the speed of flood waters and distribute them more slowly over the floodplain. Wetlands store carbon within their plant communities and soil instead of releasing it to the atmosphere as carbon dioxide. Thus, wetlands help to moderate global climate conditions. Stormwater contaminated with sediment can harm wetlands by, among other things, suffocating the native species and allowing noxious and invasive species to come in and dominate the area. Sedimentation can also decrease wetland volume, decrease the duration that wetlands retain water, and change plant community structure. This can severely harm vegetation, soils, and downstream water quality and significantly increase the risk of flooding.

19.     To minimize polluted stormwater discharges from industrial facilities, EPA has issued a general industrial stormwater permit ("Stormwater Permit") under the NPDES program. EPA first issued the Stormwater Permit in 1995 and reissued the permit in 2000, 2008, and 2015.

*See* 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008); 80 Fed. Reg. 34403 (June 4, 2015); 86 Fed, Reg.10269 (Feb. 19, 2021).[1]

20. Concrete Products Manufacturing facilities are subject to the requirements of the Stormwater Permit. Stormwater Permit, Appendix D, pg. D-2.

21. The Stormwater Permit requires these facilities to, among other things:

   a. prepare a stormwater pollution prevention plan ("SWPPP") that, among other things, describes the facility and identifies all stormwater outfalls, 2015 Stormwater Permit, pg. 31; 2021 Stormwater Permit, pg. 56;

   b. submit to EPA a "Notice of Intent" to be covered by the Stormwater Permit that lists all stormwater outfalls by a unique 3-digit code and corresponding latitude and longitude coordinates, Stormwater Permit, Appendix G;

   c. select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges, 2015 Stormwater Permit, pg. 14; 2021 Stormwater Permit, pg. 17;

   d. collect and analyze stormwater samples from all outfalls for compliance with benchmarks applicable to Concrete, Gypsum, and Plaster Products facilities, 2015 Stormwater Permit, pg. 64; 2021 Stormwater Permit, pg. 84;

   e. continue to monitor for compliance with benchmarks from all outfalls until the average value of four quarterly samples for each parameter at that outfall is below

---

[1] The February 2021 revision of the Stormwater Permit ("2021 Stormwater Permit") is substantially similar to the 2015 version ("2015 Stormwater Permit"). Where there is a difference in citations due to numbering, this Complaint provides citations to each of the revisions. Where there is no difference in section numbering, this Complaint refers to the two versions jointly as "Stormwater Permit."

the benchmark, 2015 Stormwater Permit, pgs. 41-43; 2021 Stormwater Permit, pgs. 36-39;

f.  report all benchmark monitoring results for all facility outfalls to EPA by specified deadlines, 2015 Stormwater Permit, pgs. 48-49; 2021 Stormwater Permit, pgs. 65-66; and

g.  conduct routine facility inspections at least quarterly (2015 Stormwater Permit, pg. 22; 2021 Permit, pgs. 26-27) and quarterly visual assessments (2015 Stormwater Permit, pg. 24; 2021 Stormwater Permit, pgs. 28-29) to, among other things, sample and assess the quality of the facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharge, and timely perform corrective actions when they are not, 2015 Stormwater Permit, pgs. 22-26; 2021 Stormwater Permit, pgs. 26-30.

*Citizen Suit Provision of the Federal Clean Water Act*

22. Section 505(a)(1) of the Act authorizes citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants. 33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).

23. The Commonwealth may bring a suit under Section 505 of the Act, because it is a "person" having an interest which is or may be adversely affected. *See* Section 505(g); 33 U.S.C. § 1365(g).

24. Under Section 505 of the Clean Water Act, this Court has authority to enjoin Shea's violations of the Act's prohibition on unauthorized discharges of pollutants and to require the

Company to comply with its Stormwater Permit. The Court also has authority to impose penalties of up to $55,800 per day for each of the company's prior violations. *See* 33 U.S.C. §§ 1365(a); 1319(d); 40 C.F.R. §§ 19.4; 85 Fed. Reg. 83818 (Dec. 23, 2020).

## STATEMENT OF FACTS

### Description of the Shea Facility & Activities

25. Shea manufactures and stores precast concrete products on approximately 24 acres of mostly deforested land covered by exposed sediment such as silt, sand, and gravel ("Surface Sediment"). As such, Shea is a Concrete, Gypsum, and Plaster Products facility as specified under Sector E in Table D-1 of Appendix D of the Stormwater Permit.

26. Merrimack River Wetlands border the entirety of the Facility's northern edge, which comprises approximately 2,600 feet.

27. Shea stores raw material and finished material, including various aggregates and precast concrete forms ("Industrial Material") uncovered outside at various locations at the Facility.

28. Shea moves Industrial Material around the Facility using trucks, tractors, and other heavy equipment ("Equipment").

29. Surface Sediment, Industrial Material, and pollutants that are present in or adhere to Surface Sediment and Industrial Material (collectively, "Pollutants") become mobilized by Equipment at the Facility and are tracked around and off the Facility by Equipment.

### Shea's Discharge of Pollutants from the Facility

*Polluted Industrial Stormwater Discharges to*
*the Merrimack River Wetlands and the Amesbury Municipal Storm Drain System*

30. Industrial Material and Surface Sediment at the Facility are exposed to precipitation.

31. Pollutants become mobilized by stormwater.

32. The northern section of the Facility slopes to the north towards adjacent Merrimack River Wetlands.

33. The southern section of the Facility slopes to the south, dropping 20 feet down a paved driveway which serves as the main access route to the Facility. The driveway of the Facility intersects with Haverhill Road.

34. The following screenshots taken from Google Earth (image captured October 2018) and annotated by the Attorney General's Office show the direction of flow of Shea's polluted stormwater as it enters the municipal catch basins located on Haverhill Road ("Municipal Catch Basins") on both the east and west sides of the driveway.





35. The Municipal Catch Basins lead to the Amesbury Municipal Storm Drain System, which flows to Merrimack River Wetlands.

36. Pollutants tracked around the Facility by Equipment are picked up in stormwater and discharged into the Amesbury Municipal Storm Drain System, which flows to Merrimack River Wetlands.

37. Shea stores Industrial Material on portions of the Facility that are adjacent to Merrimack River Wetlands. Stormwater flows over Industrial Material on the Facility and into Merrimack River Wetlands at the northern boundary of the Facility.

38. Merrimack River Wetlands to the north of the Facility flow to an area designated by the Commonwealth as "Core Habitat" critical for supporting important wetland functions.

### Shea's Inadequate Implementation of EPA's Stormwater Requirements

39. On or around November 19, 2015, Shea submitted a Notice of Intent to be covered by the Stormwater Permit.

40. Shea's Notice of Intent to be covered by the Stormwater Permit identified only one outfall at the Facility, "Outfall 001," located at GPS coordinates +42.8450, -70.9521. In addition to Outfall 001, there are other locations at the Facility where Shea discharges stormwater. These locations include but are not limited to areas abutting Merrimack River Wetlands along the entire northern edge of the Facility ("Northern Outfalls") and at the end of Facility's driveway on Haverhill Road ("Driveway Outfalls").

41. Shea's stormwater, which discharges from the Northern Outfalls and the Driveway Outfalls, contains pollutants.

42. Shea failed to monitor stormwater from the Northern Outfalls and Driveway Outfalls.

43. Since at the latest, August 6, 2016, Shea has failed to:

   a. prepare a SWPPP for the Facility that, among other things, includes the location of all stormwater outfalls (violations of 2015 Stormwater Permit section 5.2.2; 2021 Stormwater Permit section 6.2.);

   b. submit a "complete and accurate Notice of Intent" for the Facility that lists all stormwater outfalls by a unique 3-digit code and corresponding latitude and longitude coordinates (violations of Stormwater Permit Appendix G; 2015 Stormwater Permit section 1.2.1; 2021 Stormwater Permit section 1.3);

   c. select, design, install, and implement pollutant control measures that minimize pollutants in stormwater discharges (violations of Stormwater Permit section 2.1);

   d. collect and analyze stormwater samples for compliance with EPA benchmarks that apply to Concrete, Gypsum, and Plaster Products facilities, including for Iron and

total suspended solids ("TSS") (violations of 2015 Stormwater Permit sections 6, 8.E.4; 2021 Stormwater Permit sections 4, 8.E.5);

e. monitor for compliance with benchmarks from all outfalls until the average value of four quarterly samples for each parameter is below the benchmark (violations of 2015 Stormwater Permit section 6.2.1.2; 2021 Stormwater Permit section 4.2.2.3);

f. report all benchmark monitoring data to EPA within mandatory deadlines (violations of 2015 Stormwater Permit section 7.4; 2021 Stormwater Permit section 7.3); and

g. conduct routine facility inspections at least quarterly and quarterly visual assessments to, among other things, sample and assess the quality of the facility's stormwater discharges, ensure that stormwater control measures required by the permit are functioning correctly and are adequate to minimize pollutant discharge, and timely perform corrective actions when they are not (violations of Stormwater Permit sections 3.1. and 3.2).

**FIRST CAUSE OF ACTION**

**Noncompliance with the Federal Stormwater Permit:
Violations of Section 301(a) of the Federal Clean Water Act, 33 U.S.C. § 1311(a)**

44. The Commonwealth realleges and incorporates by reference the allegations contained in the above paragraphs.

45. Shea Concrete Products, Inc. is a "person" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

46. The Merrimack River Wetlands are "navigable waters" within the meaning of Section 502(7) of the Clean Water Act, 33 U.S.C. § 1362(7).

47. By failing to perform the actions set forth in paragraph 43 above, Shea has violated and continues to violate Section 301(a) of the Act, 33 U.S.C. § 1331(a).

48. Each of Shea's violations of each of the requirements of the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a), for each day on which the violation occurred and/or continued. *See also* Section 505(a)(1) and (f), 33 U.S.C. §§ 1365(a)(1) and (f).

49. These violations establish an ongoing pattern of failure to comply with the Stormwater Permit's requirements.

## RELIEF REQUESTED

Wherefore, the Commonwealth respectfully requests that this Court grant the following relief:

1. Require Shea to comply with EPA's federal Stormwater Permit;

2. Order Shea to pay civil penalties of up to $55,800 per day for each of the company's prior violations;

3. Order Shea to take appropriate actions to restore the quality of protected resource areas and waterways impaired by its activities;

4. Award the Commonwealth's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

5. Award any such other and further relief as this Court may deem appropriate.

Dated: April 2, 2021

Respectfully submitted,

COMMONWEALTH OF MASSACHUSETTS

By its attorneys,

MAURA HEALEY
ATTORNEY GENERAL

*/s/ Nora J. Chorover*

Nora J. Chorover (Bar No. 547352)
Special Assistant Attorney General
Emily K. Mitchell (Bar No. 703726)
Attorney
Environmental Protection Division
Office of the Attorney General
One Ashburton Place, 18th Floor
Boston, Massachusetts 02108
Tel: (617) 727-2207
Nora.Chorover@mass.gov